UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHELLEY A. CASHEL, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) Case No. 4:06-CV-841 (JCH) |
| LITTLELL INTERNATIONAL, INC., | ) |
| Defendant. | ) |

## **MEMORANDUM AND ORDER**

The matter is before the Court on Defendant Littel International, Inc.'s Motion for Summary Judgment (Doc. No. 29), filed September 28, 2007. The matter is fully briefed and ready for disposition.

## **BACKGROUND**

Plaintiffs Shelley Cashel, Mary Cashel, and Eugene Cashel, who all reside in Missouri, are the surviving widow and parents of Mark Cashel ("Cashel"), now deceased. (Am. Compl., Doc. No. 22 at ¶¶ 1, 3). Defendant is an Illinois corporation that manufactures "uncoiliers, straighteners, feeds, reels, and accessories for the press room and coil processing industries." (Def.'s Memo. in Supp. of Mot. for Sum. J. ("Memo. in Supp."), Doc. No. 30 at Ex. D ¶ 2).

Cashel worked as a maintenance mechanic at Lemay Machine Company ("LMC"). (Def.'s Statement of Uncontroverted Martial Facts ("Def.'s Facts"), Doc. No. 30-2 at ¶¶ 1, 8). One of the machines used by LMC was a 1979 Littell Powered Coil Reel Model 60-30 ("Reel"). (Id. at ¶ 8). Defendant manufactured and sold the Reel, which is used to feed coiled steel to a press that stamps machine parts, in 1979. (Id. at ¶¶ 9, 10). As originally designed, the Reel had four twenty-thee inch

1

coil retaining arms attached to it. (Memo in Supp. at Ex F pp. 13-14). These retaining arms, or "keepers," are located on either side of the steel coil and keep it in place while the Reel is in use. (Id. at p. 2). The Reel was originally equipped with a "control {or 'dancer') arm that controlled the position of the steel payoff to control the height of the loop and the control speed." (Def.'s Facts at ¶ 19). A limit switch[1] mounted on the Reel's side controlled the dancer arm. (Id. at ¶ 20). A control panel activated and deactivated the Reel's rotation. (Id. at ¶ 21).

LMC bought the Reel from Venture Machinery, Inc. in 1993. (Id. at ¶ 11). After purchasing the Reel, LMC made two important modifications to it.[2] First, LMC replaced the original keepers with twenty-eight inch keepers. (Id. at ¶ 15). LMC then altered the Reel's base by raising it five inches off the ground in order to keep the original amount of clearance between the floor and the keepers. (Pls.' Facts at Ex 9 pp. 15-16). Secondly, it replaced the limit switch and dancer arm with a new limit switch attached to a piece of wire,[3] which functioned as a limit switch actuator. (Def.'s Facts at ¶ 24). This new limit switch and actuator were located at the Reel's base. (Pl.'s Facts at Ex. 10). Unlike the "single polarity" dancer arm, the new actuator had "dual polarity," meaning the Reel began rotating when the wire was pressed up or down. (Def.'s Facts at ¶ 30). Defendant contends that following these changes, the actuator had to be pressed up on down to start the Reel's rotation. (Memo. in Supp. at Ex. 4 ¶ 8). Plaintiffs contend that the control panel still controlled the Reel's rotation. (Pl.'s Facts at Ex. 11).

On November 1, 2005, Donna Potter ("Potter"), a press operator, contacted Cashel because the Reel was improperly feeding the coiled steel to the machine press she was operating. (Pls.' Facts

---

[1]A limit switch automatically cuts off current to a electric motor when an object moved by it has passed a given point.

[2]Defendant was not aware of the modifications. (Def.'s Facts at ¶ 13).

[3]The wire resembles a straightened metal coat hangar. (Pls.' Facts at Ex. 3).

at Ex. 7 p. 18). Cashel and Cherri Wise ("Wise"), another employee, began examining the Reel. (Id. at p. 20). Potter noticed that Wise and Cashel had not unplugged the Reel, which violated LMC's safety policy of unplugging equipment before performing maintenance on it. (Def.'s Facts at ¶¶ 31, 37). A few minutes later, Potter heard a scream and saw a "hysterical" Wise standing next to Cashel, who was lying near the Reel with injuries to his head.[4] (Pls.' Facts at Ex. 7 p. 28). Wise then told Potter, "I told him not to touch the wire. I told him not to touch the wire."[5] (Id. at p. 28). When asked how Cashel ended up behind the Reel, Wise said, "he touched that wire which the made the coil reel and catch his head and flip him over on to the – up behind the press."[6] (Id.). Cashel died within minutes of the accident. (Memo. in Supp. at Ex. M). The parties agree that his head wound came from being struck by a keeper arm.

Plaintiffs filed their Complaint April 25, 2006 and amended it on March 15, 2007. (Doc. No. 1, 22). Plaintiffs allege the following wrongful death causes of action against Defendant: 1) Strict Liability (Defective Design/Failure to Warn), and 2) Negligence. (Id. at pp. 4-9). According to Plaintiffs, the Reel was defectively designed in that:1) its keeper arms were unreasonably dangerous;

---

[4] According to the police report, Cashel had "an approximately 9" x 1" x 1" cut to the left side of the head with penetration to the skull exposing brain matter with an excessive loss of blood." (Memo. in Supp. at Ex. M).

[5] The Federal Rules of Evidence except from the hearsay rule an out-of-court statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). In order to find that the exception applies, it must appear that the declarant's "condition at the time was such that the statement was spontaneous, excited or impulsive rather than the production of reflection and deliberation." United States v. Bercier, --- F.3d ---, 2007 WL 3196530, at * 3 (8th Cir. Nov. 1, 2007). Factors to be considered when making this determination include: the lapse of time between the startling event and the statement; the age of the declarant; the physical and mental condition of the declarant; the characteristics of the event; and the subject matter of the statements. United States v. Iron Shell, 633 F.2d 77, 86 (8th Cir. 1980). Wise's statements, made moments after seeing Cashel being fatally injured, meet this exception.

[6] The record is unclear if this language is a direct quotation or is Potter's interpretation of what Wise said.

3

2) it had no safety guards to prevent an operator from becoming entrapped in the machine; 3) it had no emergency stop button or device; 4) it had no reverse mechanism; 5) it was not equipped with an interlock device to turn off the machine during repairs; and 6) it had an unreasonably dangerous initiation device. (Id. at pp. 4-5). Plaintiffs also allege that Defendant failed to warn Cashel about the dangers associated with the Reel. (Id.). In its summary judgment motion, Defendant asserts that Plaintiffs' claims fail because the modifications made after the Reel left its control could have proximately caused Cashel's death. (Memo. in Supp. at p. 4).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

4

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

As a federal court sitting in diversity, this Court must apply the laws of the State of Missouri. Altru Health Sys. v. Am. Prot. Ins. Co., 238 F.3d 961, 962 (8th Cir. 2001). The Court looks first to decisions of the Missouri Supreme Court. Blum v. Allstate Ins. Co., 296 F. Supp.2d 1037, 1039 (E.D. Mo. 2003). If no relevant decisions are available, the Court will look to Missouri appellate court decisions. Id. The task is "to determine how the Missouri Supreme Court would decide the issue at hand." Id.

## DISCUSSION

As previously stated, Plaintiffs allege that the Reel was defectively designed. Defendant contends that Plaintiffs' claims fail because the modifications to the Reel, including the replacement of the dancer arm and the addition of longer keeper arms, proximately caused Cashel's injury.[7]

In order to prevail in a products liability action under a theory of defective design, Plaintiffs must establish that, "1) defendant sold the product in the course of its business; 2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use; 3) the product was used in a manner reasonably anticipated; and 4) plaintiff was injured as a direct result of such defective condition as existed when the product was sold." Stanger v. Smith & Nephew, Inc., 401 F. Supp. 2d 974, 978 (E.D. Mo. 2005) (internal quotations and citations omitted). As to the

---

[7] Defendant asserts that Cashel's own negligence, by failing to unplug the Reel, caused his death. Missouri law provides that a plaintiff's own negligence "shall not bar recovery." See Mo. Rev. Stat. § 537.765. Rather, a plaintiff's negligence merely diminishes the amount of damages. Id. The jury determines how much the damages are diminished. Eide v. Midstate Oil Co., 895 S.W.2d 35, 40 (Mo. Ct. App. 1995).

5

fourth element, Plaintiffs must produce evidence "that neither [they] nor any third person has made alterations to the product, which would create a defect that could be the proximate cause of the damages incurred." Jasinski v. Ford Motor Co., 824 S.W.2d 454, 455 (Mo. Ct. App. 1992) (citation omitted). Subsequent changes or alterations in a product do not relieve the manufacturer of strict liability if the changes were foreseeable and did not render the product unsafe. Carlisto v. Gen. Motors Corp., 870 S.W.2d 505, 509 (Mo. Ct. App. 1994). Where there is conflicting evidence about whether a modification proximately caused plaintiff's injury, "it is generally a question for the jury to determine whether the defect is traceable to the time the product left the manufacturing company." Hales v. Green Colonial, Inc., 490 F.2d 1015, 1021 (8th Cir. 1971).

Upon consideration, the Court will deny Defendant's summary judgment motion because the parties have put forward substantial conflicting evidence about whether the modifications caused Cashel's death. Plaintiffs' expert states that the Reel's design was defective at the time it left Defendant's control because it had unreasonably dangerous keeper arms instead of a keeper disk. (Pls.' Facts at Ex. 2). Plaintiffs' expert testified that the defective design created pinch points that can cause the inadvertent entrapment of an operator and that this defect proximately caused Cashel's injury. (Id. at Ex. 2, Ex. 4 pp. 53-56, 81-86). Plaintiffs also presented evidence that the height of the bloodstains on the Reel shows that the injury may have occurred even with the original keeper arms. (Pls.' Facts at ¶ 24). Conversely, Defendant submitted evidence that the modifications caused Cashel's death. Specifically, Defendant's expert posits that the new limit switch and wire actuator caused Cashel's death because the "original limit switch and actuator arm assembly were located in a position where Mr. Cashel's head would not have been in danger of being struck by a Keeper arm." (Memo. in Supp. at Ex. J p. 8). Additionally, Defendant's expert opines that the accident would not have occurred if LMC did not install longer keeper arms. (Id.). Finally, Defendant believes that

Potter's testimony shows that the new limit switch and actuator caused Cashel's death. (Id. at Ex. H p. 28).

Additionally, courts faced with similar evidentiary conflicts in products liability actions have refused to enter summary judgment for the defendant. In Leonard v. Bunton Co., plaintiff brought a products liability action against a lawn mower manufacturer after injuring his hand in an engine belt. 925 F. Supp. 637, 642-44 (E.D. Mo. 1996). Plaintiff claimed that the lawn mower was defectively designed because it lacked a "dead man" switch, and defendant countered that modifications made to the belt drive covering caused the injury. Id. The court refused to grant defendant's summary judgment motion because plaintiff had evidence that his injury was caused by a defect existing at the time it was manufactured. Id. In Gabler v. Robbins & Myers, Inc., the plaintiff brought a products liability suit against the manufacturer of a hoist after it failed and injured him. 895 S.W.2d 79, 81-82 (Mo. Ct. App. 1995). Defendant asserted that the court should grant its summary judgment motion because the hoist had been modified in numerous ways. Id. The Court held that summary judgment was not appropriate because plaintiff presented evidence that his injury was actually caused by defects existing when the hoist was manufactured. Id.; see Vanskike v. ACF Indus., Inc., 665 F.2d 188, 195 (8th Cir. 1981) (coming to similar holding); see also Hales, 490 F.2d at 1020-21. As such, the Court will deny Plaintiff's motion for summary judgment and allow the jury to decide between the conflicting evidence.[8]

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 29) is **DENIED**.

---

[8]Defendant also contends that Plaintiffs' negligence claim fails because they cannot make a submissible strict liability claim. Because the Court finds that the strict liability claim can go the jury, this argument is without merit.

Dated this 10th day of December, 2007.

                                                /s/ Jean C. Hamilton
                                                UNITED STATES DISTRICT JUDGE